706 A.2d 621

**In re MELANIE H.**

**No. 941, Sept. Term, 1997.**

Court of Special Appeals of Maryland.

March 2, 1998.

Margaret L. Lanier, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for Appellant.

Regina Hollins Lewis, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for Appellee.

Argued before DAVIS and SALMON, JJ., and THEODORE G. BLOOM, Judge (retired), Specially Assigned.

THEODORE G. BLOOM, Judge (retired), Specially Assigned.

The Circuit Court for Montgomery County, sitting as a juvenile court, found that appellant, Melanie H., had committed the delinquent act of possessing a deadly weapon on public school property and placed her on probation. Melanie noted a timely appeal and presents two questions for our review:

I. Was the evidence sufficient to support the charge of possession of a deadly weapon on public school property?

II. Did the court err in refusing to suppress the butter knife recovered from Melanie's locker?

We answer the first question in the negative and reverse the judgment of the juvenile court. As a result of our holding in the first question, we need not address the second.

## FACTS

At the adjudication hearing, the State presented the testimony of one witness, Patrick Rooney, who stated that he worked as a "security assistant" at the Mark Twain School in Rockville, which Melanie attended. Mr. Rooney added that he had been a police officer for seventeen years. On November 11, 1996, Mr. Rooney was informed by "other staff members" that Melanie was late to school and that she smelled of "burnt marijuana." Upon approaching Melanie, he also smelled the odor of burnt marijuana and noticed that she "seemed a little bit under the influence of something." Mr. Rooney had Melanie conduct a "self search," which required that she empty all her pockets and turn them inside out. This search did not reveal anything on Melanie's person.

Mr. Rooney and other school personnel then searched Melanie's locker, which was thirty to forty feet from where he had stopped her. Mr. Rooney explained that the school was for students with "severe emotional problems" and that, at the beginning of the year, all parents had signed a consent form allowing school officials to search the students' lockers. Upon opening Melanie's locker, Mr. Rooney removed her book bag and, inside the bag, found a "silver flatware knife." Mr. Rooney stated that he knew that the book bag belonged to Melanie as he had seen it in her possession on prior occasions. Melanie admitted that the knife belonged to her and informed Mr. Rooney that she used it to break into the food cabinet at her group home late at night when she was hungry.

## DISCUSSION

### I.

At the close of all the evidence, Melanie's attorney argued that the knife was not a weapon as it was simply a butter knife with a "rounded edge." Counsel further argued that there was no evidence that the knife was used as a weapon; rather, the evidence demonstrated that it was used as a tool to pry open locks in Melanie's group home. Counsel also referred

the court to *Anderson v. State,* 328 Md. 426, 614 A.2d 963 (1992), which dealt with Art. 27, § 36(a). The juvenile court denied the motion, stating:

I deny your motion. You're arguing law that applies to section thirty-six. She's charged with a violation of section thirty-six A . . . which is very clear. No person, shall carry or possess any knife, on any school property, in this state. Public school property in this state. She's a person, she had a knife, she was on the school property, it's Montgomery County School Property. Very simple. Denied.

Melanie contends that the juvenile court erred in denying her motion for judgment of acquittal as the Legislature intended Md.Code (1957, 1996 Repl.Vol.), Art. 27, § 36A, to proscribe only the possession of objects that are *per se* deadly weapons or objects that are intended for or readily adapted for use as deadly weapons. She alleges that "[a]n interpretation of the statute which views it as criminalizing possession of a butter knife, in the absence of evidence that the butter knife was intended for use as a weapon, is erroneous." Melanie stresses the presence of knives in the school setting from the cafeteria to home economics classes to the biology lab to the drama department, none of which is listed as an exception in the statute. She argues that the Legislature "intended to proscribe the possession of deadly weapons, not the possession of all manner of knives, on school property." She also claims that "the [L]egislature intended to prohibit possession of a knife when that knife is *per se* a deadly weapon, or when there is evidence that the possessor had the intent to *use* the knife as a deadly weapon." Citing *Anderson v. State, supra,* she alleges that the knife found in her book bag falls outside both classes.

 Article 27, § 36A provides:

**§ 36A. Carrying or possessing deadly weapon upon school property.**

(a) *In general.*—No person, unless otherwise excepted in this section, shall carry or possess any rifle, gun, knife, or

deadly weapon of any kind on any public school property in this State.

(b) *Exceptions.*—Nothing in this section shall be construed to apply to:

(1) Law enforcement officers in the regular course of their duty;

(2) Persons hired by the boards of education in the counties and Baltimore City specifically for the purpose of guarding public school property;

(3) Persons engaged in organized shooting activity for educational purposes; or

(4) Persons who, with a written invitation from the school principal, display or engage in historical demonstrations using weapons or replicas of weapons for educational purposes.

(c) *Penalty.*—Any person who violates this section shall, upon conviction, be guilty of a misdemeanor and shall be sentenced to pay a fine of no more than $1,000 or shall be sentenced to the Maryland Department of Correction for a period of not more than 3 years. Any such person who shall be found to carry a handgun in violation of this section, shall be sentenced as provided in § 36B of this article.

"The cardinal rule in statutory construction is to determine and effect the intent of the Legislature. The primary source for determining the Legislature's intent is the statute itself." *McNeil v. State,* 112 Md.App. 434, 450, 685 A.2d 839 (1996) (citations omitted). "The starting point in statutory interpretation is with an examination of the language of the statute. If the words of the statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning, we will give effect to the statute as it is written." *Jones v. State,* 336 Md. 255, 261, 647 A.2d 1204 (1994) (citations omitted). Nonetheless, in *Morris v. Prince George's County,* 319 Md. 597, 573 A.2d 1346 (1990), the Court of Appeals explained that we are not limited to examining only the statutory language in determining legislative intent:

[O]ur endeavor is always to seek out the legislative purpose, the general aim or policy, the ends to be accomplished, the evils to be redressed by a particular enactment. In the conduct of that enterprise, we are not limited to study of the statutory language. The plain meaning rule " 'is not a complete, all-sufficient rule for ascertaining a legislative intention....' " The "meaning of the plainest language" is controlled by the context in which it appears. Thus, we are always free to look at the context within which statutory language appears. Even when the words of a statute carry a definite meaning, we are not "precluded from consulting legislative history as part of the process of determining the legislative purpose or goal" of the law.

*Id.* at 603–04, 573 A.2d 1346 (citations and footnote omitted). *See also Rose v. Fox Pool Corp.,* 335 Md. 351, 360, 643 A.2d 906 (1994) (citations omitted) (legislative history of a statute is " 'external manifestation[ ]' or 'persuasive evidence' of legislative purpose that may be taken into consideration.") Further, "[t]hat which necessarily is implied in the statute is as much a part of it as that which is expressed." *Soper v. Montgomery County,* 294 Md. 331, 335, 449 A.2d 1158 (1982). "In analyzing the statute's language, however, 'we seek to avoid constructions that are illogical, unreasonable, or inconsistent with common sense.' " *McNeil,* 112 Md.App. at 451, 685 A.2d 839 (quoting *Frost v. State,* 336 Md. 125, 137, 647 A.2d 106 (1994)). *See also State v. Thompson,* 332 Md. 1, 8, 629 A.2d 731 (1993) ("each statute must be given a reasonable interpretation, not one that is illogical or incompatible with common sense"); *Barr v. State,* 101 Md.App. 681, 687, 647 A.2d 1293 (1994) ("courts must read all parts of a statute together, with a view toward harmonizing the various parts and avoiding both inconsistencies and senseless results that could not reasonably have been intended by the Legislature").

We first turn to two Court of Appeals cases. Although they do not address § 36A, they do offer us some guidance. *Brooks v. State,* 314 Md. 585, 552 A.2d 872 (1989), involved an aggravated robbery prosecution. The defendant had placed a plastic toy pistol in the waistband of his trousers. Upon the

defendant's arrest, the toy pistol was seized from his jacket. The Court of Appeals determined that a plastic toy pistol could not be considered a "dangerous or deadly weapon" under Art. 27, § 488.[1] The Court adopted an objective standard in determining whether an object could be considered a "dangerous or deadly weapon" under that section. The court held that

> for an instrument to qualify as a dangerous or deadly weapon under § 488, the instrument must be (1) designed as " 'anything used or designed to be used in destroying, defeating, or injuring an enemy, or as an instrument of offensive or defensive combat,' " [*Bennett and Flynn v. State*, 237 Md. 212, 214–15, 205 A.2d 393 (1964) ]; (2) under the circumstances of the case, immediately useable to inflict serious or deadly harm (*e.g.*, unloaded gun or starter's pistol useable as a bludgeon); or (3) actually used in a way likely to inflict that sort of harm (*e.g.*, microphone cord used as a garrote).

314 Md. at 600, 552 A.2d 872 (footnote omitted).

In a footnote, the Court of Appeals referred to § 36A, commenting:

> A more recently-adopted law, Art. 27, § 36A, proscribes the carrying or possessing of "any rifle, knife, or deadly weapon on public school property." Section 36A was enacted by Ch. 614, Acts of 1971, the title which directs that the law is "to be under the new subheading 'Carrying Deadly Weapons on Public School Property.' " This statute is another indication of the legislature's use of an objective test for the definition of deadly weapons.

*Id.* at 600 n. 9, 552 A.2d 872.

The Court of Appeals has also adopted an objective test in determining whether an instrument is a dangerous or deadly weapon under Art. 27, § 36. In *Anderson v. State*, 328 Md.

---

1. Article 27, § 488 provides: "Every person convicted of the crime of robbery or attempt to rob with a dangerous or deadly weapon ... is guilty of a felony...."

426, 614 A.2d 963 (1992), the defendant was approached by a police officer in an area known to be an "open air drug market" and asked by the officer if he had any type of weapon or knife on his person. The defendant took a "razor knife," a type of utility knife, from his back pants pocket and told the officer that he used the knife on his job. He did not inform the officer of the type of job he used the knife for. He was convicted of wearing and carrying a concealed dangerous or deadly weapon under § 36(a).[2]

The Court had previously determined that the items specifically listed in § 36(a), *e.g.*, dirk knife, Bowie knife, switchblade knife, etc., were dangerous and deadly weapons *per se*. *Mackall v. State*, 283 Md. 100, 106, 387 A.2d 762 (1978). In *Anderson*, the Court held that "[f]or objects not legislatively classified as dangerous and deadly *per se*, such as the utility knife here, the State must prove that the object is within the class described as 'any other dangerous or deadly weapon of any kind.'" *Id.* at 434, 614 A.2d 963. In discussing the standard to be applied when an instrument is not *per se* a dangerous or deadly weapon, the Court reviewed several cases, including *Simpler v. State*, 318 Md. 311, 568 A.2d 22 (1990). In *Simpler*, the defendant, on a prior occasion, had shown a police officer a carpet knife that he was carrying and was not arrested. On a later date, the officer stopped and frisked the defendant. The State argued that the stop and frisk was justified by the officer's knowledge that the defendant had carried the carpet knife on a prior occasion. The Court of Appeals recognized that there was no evidence that the knife was a dangerous weapon as the defendant had not been hostile toward the officer, the officer had continued their

---

**2.** Section 36 provides in relevant part:

Every person who shall wear or carry any dirk knife, bowie knife, switchblade knife, star knife, sandclub, metal knuckles, razor, nunchaku, or any other dangerous or deadly weapon of any kind, whatsoever (penknives without switchblade and handguns, excepted) concealed upon or about his person, and every person who shall wear or carry any such weapon, chemical mace, pepper mace, or tear gas device openly with the intent or purpose of injuring any person in any unlawful manner, shall be guilty of a misdemeanor. . . .

conversation within the confines of his police car without taking the knife from the defendant's possession, and there was no evidence regarding the defendant's employment or whether the knife was a tool he used at his job. 328 Md. at 437, 614 A.2d 963 (quoting *Simpler,* 318 Md. at 321, 568 A.2d 22). The *Anderson* Court commented, "Implicit in this analysis is that all knives are not dangerous or deadly weapons and that, depending on the circumstances, the concealed carrying of some cutting tools may be considered lawful." *Id.*

In *Anderson,* the State argued that § 36(a) required only an intent to carry the instrument in a concealed fashion and looked solely to the object's physical potential as a weapon, without considering the purpose of the person carrying the instrument. The Court commented:

> The State's construction produces results so closely approaching the absurd that we do not consider it to be the construction intended by the General Assembly. For example, the carpenter who carries screwdrivers, drills, chisels, and one or more hammers in a closed tool box is carrying, concealed, potential daggers and clubs, and would violate § 36. The woman who affixes her hat with a hat pin, covered by the hat and her hair, is carrying, concealed, a potential stiletto, and would violate § 36. Persons who wear belts around their waists, covered by coats, jackets, or sweaters, carry concealed, potential garrotes and would violate § 36.
>
> The State's answer at oral argument to these *reductio ad absurdum* examples is that the concealed wearing and carrying of such items on or about the person would not be criminally charged, in the exercise of the police officer's or the prosecutor's discretion. That construction of § 36(a), however, raises due process questions concerning notice to the public of the conduct that is considered criminal. A construction of a statute which would cast doubt on its constitutional validity should be avoided.

328 Md. at 437–38, 614 A.2d 963.

The Court concluded:

In order to violate § 36(a) by the concealed wearing or carrying of an instrument which has not legislatively been declared to be a dangerous or deadly weapon *per se,* the trier of fact must first determine whether the instrument constitutes a "dangerous or deadly weapon." The concealed carrying prohibition of § 36(a) is not violated simply because the instrument can be used to inflict serious or deadly harm. The person carrying the object must have at least the general intent to carry the instrument for its use as a weapon, either of offense or defense. It is a question of fact, to be decided based on all of the circumstances.

*Id.* at 438, 614 A.2d 963.

Turning to the present case, we note that unlike § 36, which defines several of the weapons that are dangerous or deadly *per se,* § 36A contains no such definitions. Section 36F, however, defines a rifle as "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed metallic cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger." In addition, although Art. 27, § 36F provides definitions for a handgun, antique firearm, rifle, short-barreled shotgun, short-barreled rifle, and shotgun, "knife" and "gun" are not defined terms within Article 27. Finally, the weapons that are considered dangerous or deadly *per se* in § 36(a) are specific items. In contrast, the listed instruments in § 36A, other than rifle, which is clearly defined in § 36F, prohibits the possessing or carrying of broad categories of instruments, *i.e.,* any knife or gun.

The State looks to the plain language of the statute and argues that it clearly prohibits the possessing or carrying of "any knife" on school property. As the item found in Melanie's possession was a knife, the State continues, the juvenile court properly found her to be delinquent. The State further argues that there was no evidence to support Melanie's assertion that knives abound in public schools and stresses that Melanie was attending a school for students with emotional problems, which might have stricter standards regarding the

presence of knives on school property. The State also claims that "in any event, there is a difference between knives provided by the school to use for a particular purpose and the carrying and possession of a knife by a student." The State does not, however, explain what that difference is or where this distinction can be found within the plain language of the statute. This argument is similar to that presented by the State in *Anderson* and rejected by the Court of Appeals when it adopted an objective test to determine whether an instrument was a dangerous or deadly weapon under § 36(a). 328 Md. at 437–38, 614 A.2d 963.

We agree with Melanie that knives are possessed and carried on public school property though there is no exception under § 36A. Although the State claims that there was no evidence of the presence of knives on school property, as the Court of Appeals refused to do in *Anderson,* we cannot ignore the benign, everyday use of items prohibited from school property under § 36A. The inclusion of all knives within that statute would result in its daily violation at, quite possibly, every public school in this State. Undoubtedly, there are knives, plastic or metal, in school cafeterias for the use of students as well as cafeteria workers. Home economics classes, in which students prepare meals, would surely require the use of knives, as would biology labs where students dissect frogs. Knives may also be used in woodworking classes. A drama department might use a knife when staging productions such as *Romeo and Juliet* or *West Side Story,* in which knives would be part of the performance, quite possibly a stage knife with the blade retracting into the hilt when someone is "stabbed" or even a rubber knife that could inflict no harm. In addition, the custodians and groundskeeper at the schools might possess knives to perform their daily work and so might any private contractors who are properly on school property. Yet, all these instruments from the cafeteria to the biology lab to the woodworking shop to the auditorium stage are labeled "knives" in our common everyday language. No exception is allowed for the possessing or carrying of these knives on

public school property.[3] We do not believe that the Legislature intended such an absurd result. Our task, therefore, is to determine the legislative intent in enacting § 36A.

The preamble to Chapter 614 of the *Laws of Maryland*, under which § 36A was enacted, provided that the legislative purpose behind the statute was "to prohibit the carrying of deadly weapons on public school property...." We note that the statute, as originally enacted, prohibited only the carrying of "any rifle, gun, knife, or deadly weapon of any kind." The prohibition against possessing such an instrument came into effect in 1981. 1981 Md. Laws Chap. 528. When the Legislature added this prohibition, the stated purpose of the act, which was repealed and reenacted, was to "prohibit[ ] a person from possessing, *under certain circumstances,* a rifle, gun, knife, or deadly weapon of any kind on public school property in this State." 1982 Md. Laws Chap. 528 (emphasis added). We believe that the legislative intent in enacting the statute was to prohibit the carrying of dangerous weapons of any kind onto public school property, particularly such deadly weapons as rifles, guns, and knives. We do not believe that the General Assembly intended to interdict any knife-shaped object, merely potentially dangerous knives.

█ Accordingly, we hold that in order to convict a person of carrying or possessing any rifle, gun, or knife on school property under Art. 27, § 36A, the State must show that the instrument possessed can, under the circumstances of the case, reasonably be considered a deadly weapon. This objective approach is in keeping with the legislative intent to prohibit the possessing and carrying of deadly weapons on public school property and will avoid the regular violation of

---

**3.** We also note that similar problems could arise from the prohibition against possessing or carrying a "gun." Under that broad term would fall several "guns" used on school property, such as a staple gun used in shop class or by workmen. An air gun used in an automotive shop class to remove the lug nuts from a tire might also be included within that broad term. In addition, a student who brings a toy water pistol to school or a drama student who uses a cap gun in a play has, under the everyday meaning of the word, possessed a "gun."

that statute by students, teachers, and staff who are engaged in the routine performance of their duties at the public schools.

■ In the present case, Melanie was stopped by Mr. Rooney because it had been reported to him that she had an odor of burnt marijuana about her. Upon approaching Melanie, Mr. Rooney also smelled the marijuana and believed that she was under the influence of something. He had Melanie conduct a "self-search," which did not reveal any contraband on Melanie's person. Mr. Rooney then proceeded to Melanie's locker, which was approximately thirty to forty feet from where he had originally stopped her. The locker had been locked with a combination lock. Inside the locker, he found a book bag and inside the bag, he found the knife in question. It was an all-metal flatware knife which had a blunt edge and a rounded end.[4] The State's Attorney described it as a "butter knife"; it is obviously not intended for slashing or stabbing. After Mr. Rooney seized the knife, Melanie admitted that it belonged to her and explained that she used it to break into locked food cabinets in the middle of the night at her group home when she was hungry, that is, as a lever rather than a knife. Under the circumstances of this case, we cannot reasonably conclude that the knife possessed by Melanie was proscribed by the statute, *i.e.,* a knife reasonably adapted for use, or capable of being used, as a deadly weapon. We therefore reverse the judgment of the juvenile court.

**JUDGMENT REVERSED. COSTS TO BE PAID BY MONTGOMERY COUNTY.**

---

4. The knife was included in the record before this Court.